BUILDING & CONSTRUCTION TRADES COUNCIL
OF THE METROPOLITAN DISTRICT *v.* ASSOCIATED
BUILDERS & CONTRACTORS OF MASSACHUSETTS/
RHODE ISLAND, INC., ET AL.

No. 91–261.   Argued December 9, 1992—Decided March 8, 1993*

---

*Together with No. 91–274, *Massachusetts Water Resources Authority et al.* v. *Associated Builders & Contractors of Massachusetts/Rhode Island, Inc., et al.*, also on certiorari to the same court.

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Charles Fried* argued the cause for petitioners. With him on the briefs were *David L. Shapiro, John M. Stevens, Arthur G. Telegen, H. Reed Witherby, Mary R. Jeka, Steven H. Goldberg, William J. Curtin, E. Carl Uehlein, Jr., Laurence J. Cohen, Victoria L. Bor, Walter Kamiat,* and *Laurence Gold.*

*Deputy Solicitor General Mahoney* argued the cause for the United States as *amicus curiae* urging reversal. With her on the briefs were *Solicitor General Starr, Edwin S. Kneedler, Jerry M. Hunter, Nicholas E. Karatinos, Norton J. Come, Linda Sher,* and *John Emad Arbab.*

*Maurice Baskin* argued the cause for respondents. With him on the briefs was *Carol Chandler.*†

Justice Blackmun delivered the opinion of the Court.

The issue in this litigation is whether the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.*, pre-empts enforcement by a state authority, acting as the owner of a construction project, of an otherwise lawful prehire collective-bargaining agreement negotiated by private parties.

I

The Massachusetts Water Resources Authority (MWRA) is an independent government agency charged by the Massachusetts Legislature with providing water-supply services, sewage collection, and treatment and disposal services for the eastern half of Massachusetts. Mass. Gen. Laws Ann., ch. 92 App., § 1–1 *et seq.* (1993). Following a lawsuit arising out of its failure to prevent the pollution of Boston Harbor, in alleged violation of the Federal Water Pollution Control Act, 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.*,

---

†Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Massachusetts et al. by *Scott Harshbarger,* Attorney General of Massachusetts, and *Douglas H. Wilkins,* Assistant Attorney General, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Robert J. Del Tufo,* Attorney General of New Jersey, and *Frank J. Kelley,* Attorney General of Michigan; for Mayor Raymond L. Flynn by *Albert W. Wallis;* and for the National Constructors Association et al. by *Robert W. Kopp* and *John Gaal.*

Briefs of *amici curiae* urging affirmance were filed for the Associated General Contractors of America by *Glen D. Nager, Richard F. Shaw,* and *Michael E. Kennedy;* for the Chamber of Commerce of the United States of America by *Clifton S. Elgarten, Stephen A. Bokat, Robin S. Conrad,* and *Mona C. Zeiberg;* for Master Printers of America by *Francis T. Coleman* and *William B. Cowen;* for the Merit Shop Foundation et al. by *Bruce J. Ennis, Jr.;* for the National Right to Work Legal Defense Foundation, Inc., by *Hugh L. Reilly, W. James Young,* and *Edwin Vieira, Jr.;* and for the Utility Contractors Association of New England, Inc., et al. by *Stephen S. Ostrach* and *Richard D. Wayne.*

MWRA was ordered to clean up the harbor. See *United States* v. *Metropolitan Dist. Comm'n*, 757 F. Supp. 121, 123 (Mass. 1991). The cleanup project was expected to cost $6.1 billion over 10 years. 935 F. 2d 345, 347 (CA1 1991). The District Court required construction to proceed without interruption, making no allowance for delays from causes such as labor disputes. App. 71 (Affidavit of Richard D. Fox, Director of the Program Management Division of MWRA). MWRA has primary responsibility for the project. Under its enabling statute and the Commonwealth's public-bidding laws, MWRA provides the funds for construction (assisted by state and federal grants), owns the sewage-treatment facilities to be built, establishes all bid conditions, decides all contract awards, pays the contractors, and generally supervises the project. See 935 F. 2d, at 347 (citing Mass. Gen. Laws Ann., ch. 92 App., §1–1 *et seq.* (1993). Mass. Gen. Laws §§ 149:44A to 149:44I, and 30:39M (1990)).

In the spring of 1988, MWRA selected Kaiser Engineers, Inc., as its project manager. Kaiser was to be primarily in charge of managing and supervising construction activity. Kaiser also was to advise MWRA on the development of a labor-relations policy that would maintain worksite harmony, labor-management peace, and overall stability throughout the duration of the project. To that end, Kaiser suggested to MWRA that Kaiser be permitted to negotiate an agreement with the Building and Construction Trades Council and affiliated organizations (BCTC) that would assure labor stability over the life of the project. App. to Pet. for Cert. in No. 91–274, p. 75a (MWRA Pet. App.). MWRA accepted Kaiser's suggestion, and Kaiser accordingly proceeded to negotiate the Boston Harbor Wastewater Treatment Facilities Project Labor Agreement (Agreement). *Ibid.* The Agreement included: recognition of BCTC as the exclusive bargaining agent for all craft employees; use of specified methods for resolving all labor-related disputes; a requirement that all employees be subject to union-security provi-

sions compelling them to become union members within seven days of their employment; the primary use of BCTC's hiring halls to supply the project's craft labor force; a 10-year no-strike commitment; and a requirement that all contractors and subcontractors agree to be bound by the Agreement. 935 F. 2d, at 348. See generally MWRA Pet. App. 107a (full text of Agreement). MWRA's board of directors approved and adopted the Agreement in May 1989 and directed that Bid Specification 13.1 be incorporated into its solicitation of bids for work on the project.[1] 935 F. 2d, at 347. Bid Specification 13.1 provides in pertinent part:

> "[E]ach successful bidder and any and all levels of subcontractors, as a condition of being awarded a contract or subcontract, will agree to abide by the provisions of the Boston Harbor Wastewater Treatment Facilities Project Labor Agreement as executed and effective May 22, 1989, by and between Kaiser . . . on behalf of [MWRA] and [BCTC] . . . and will be bound by the provisions of that agreement in the same manner as any other provision of the contract." MWRA Pet. App. 141a–142a.

In March 1990, a contractors' association not a party to this litigation filed a charge with the National Labor Relations Board (NLRB) contending that the Agreement violated the NLRA. The NLRB General Counsel refused to issue a complaint, finding: (1) that the Agreement is a valid prehire agreement under §8(f) of the NLRA, 29 U. S. C. §158(f), which authorizes such agreements in the construction indus-

---

[1] Massachusetts competitive-bidding laws require MWRA to state its preference for a contract term, such as a project labor agreement, in the form of a bid specification. These laws, which MWRA's Enabling Act explicitly incorporates, see Mass. Gen. Laws Ann., ch. 92 App., § 1–8(g) (1993) (incorporating Mass. Gen. Laws §§ 30:39M, and 149:44A to 149:44H), require that the competitive-bidding process be carried out by the awarding authority. See *Modern Continental Constr. Co.* v. *Lowell,* 391 Mass. 829, 836, 465 N. E. 2d 1173, 1177–1178 (1984).

try; and (2) that the Agreement's provisions limiting work on the project to contractors who agree to abide by the Agreement are lawful under the construction-industry proviso to §8(e), 29 U. S. C. §158(e). This proviso sets forth an exception from §8(e)'s prohibition against "hot cargo" agreements that require an employer to refrain from doing business with any person not agreeing to be bound by a prehire agreement. *Building & Trades Council (Kaiser Engineers, Inc.)*, Case 1–CE–71, NLRB Advice Memo, June 25, 1990, MWRA Pet. App. 88a.

Also in March 1990, respondent Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. (ABC), an organization representing nonunion construction-industry employers, brought this suit against MWRA, Kaiser, and BCTC, seeking, among other things, to enjoin enforcement of Bid Specification 13.1. ABC alleged pre-emption under the NLRA, pre-emption under §514(c) of the Employee Retirement Income Security Act of 1974, 88 Stat. 897, 29 U. S. C. §1144(c) (ERISA), violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, conspiracy to reduce competition in violation of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §1, and various state-law claims. Only NLRA pre-emption is at issue here.

The United States District Court for the District of Massachusetts rejected each of ABC's claims and denied its motion for a preliminary injunction. MWRA Pet. App. 76a–83a. The Court of Appeals for the First Circuit reversed and directed entry of a preliminary injunction restraining the use of Bid Specification 13.1, reaching only the issue of NLRA pre-emption. 135 LRRM 2713 (1990). The Court of Appeals subsequently granted a petition for rehearing en banc, vacating the panel opinion. MWRA Pet. App. 84a. Upon rehearing en banc, the Court of Appeals, by a 3-to-2 vote, again reversed the judgment of the District Court, once more reaching only the pre-emption issue. 935 F. 2d, at 359–360. The court held that MWRA's intrusion into the

bargaining process was pervasive and not the sort of periph-
eral regulation that would be permissible under *San Diego
Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959).
See 935 F. 2d, at 353. It also held that Bid Specification 13.1
was pre-empted under *Machinists* v. *Wisconsin Employ-
ment Relations Comm'n,* 427 U. S. 132 (1976), because
MWRA was regulating activities that Congress intended
to be unrestricted by governmental power. Because of the
importance of the issue, we granted certiorari, 504 U. S.
908 (1992).

## II

The NLRA contains no express pre-emption provision.
Therefore, in accordance with settled pre-emption principles,
we should not find MWRA's bid specification pre-empted
" ' "unless it conflicts with federal law or would frustrate the
federal scheme, or unless [we] discern from the totality of
the circumstances that Congress sought to occupy the field
to the exclusion of the States." ' " *Metropolitan Life Ins.
Co.* v. *Massachusetts,* 471 U. S. 724, 747–748 (1985) (citations
omitted). We are reluctant to infer pre-emption. See
*Cipollone* v. *Liggett Group, Inc.,* 505 U. S. 504, 516 (1992);
*Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947).
"Consideration under the Supremacy Clause starts with the
basic assumption that Congress did not intend to displace
state law." *Maryland* v. *Louisiana,* 451 U. S. 725, 746
(1981). With these general principles in mind, we turn to
the particular pre-emption doctrines that have developed
around the NLRA.

In *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S.,
at 748, we noted: "The Court has articulated two distinct
NLRA pre-emption principles." The first, *"Garmon* pre-
emption," see *San Diego Building Trades Council* v. *Gar-
mon, supra,* forbids state and local regulation of activities
that are "protected by § 7 of the [NLRA], or constitute an
unfair labor practice under § 8." 359 U. S., at 244. See also
*Garner* v. *Teamsters,* 346 U. S. 485, 498–499 (1953) ("[W]hen

two separate remedies are brought to bear on the same activity, a conflict is imminent"). *Garmon* pre-emption prohibits regulation even of activities that the NLRA only *arguably* protects or prohibits. See *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, 286 (1986). This rule of pre-emption is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' "integrated scheme of regulation," *Garmon*, 359 U. S., at 247, embodied in §§ 7 and 8 of the NLRA, which includes the choice of the NLRB, rather than state or federal courts, as the appropriate body to implement the Act. *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S., at 748–749, and n. 26.

In *Garmon*, this Court held that a state court was precluded from awarding damages to employers for economic injuries resulting from peaceful picketing by labor unions that had not been selected by a majority of employees as their bargaining agent. 359 U. S., at 246. The Court said: "Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered." *Ibid.* In *Gould*, we held that the NLRA pre-empts a statute that disqualifies from doing business with the State persons who have violated the NLRA three times within a 5-year period. We emphasized there that "the *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." 475 U. S., at 286 (citing 359 U. S., at 247).

A second pre-emption principle, *"Machinists* pre-emption," see *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S., at 147, prohibits state and municipal regulation of areas that have been left " 'to be controlled by the free play of economic forces.' " *Id.*, at 140 (citation omitted). See also *Golden State Transit Corp.* v. *Los*

*Angeles,* 475 U. S. 608, 614 (1986) *(Golden State I); Golden State Transit Corp.* v. *Los Angeles,* 493 U. S. 103, 111 (1989) *(Golden State II). Machinists* pre-emption preserves Congress' "intentional balance '"between the uncontrolled power of management and labor to further their respective interests."'" *Golden State I,* 475 U. S., at 614 (citations omitted).

In *Machinists,* we held that the Wisconsin Employment Relations Commission could not designate as an unfair labor practice under state law a concerted refusal by a union and its members to work overtime, because Congress did not mean such self-help activity to be regulable by the States. 427 U. S., at 148–150. We said that it would frustrate Congress' intent to "sanction state regulation of such economic pressure deemed by the federal Act 'desirabl[y] . . . left for the free play of contending economic forces . . . .'" *Id.,* at 150 (citation omitted). In *Golden State I,* we applied the *Machinists* doctrine to hold that the city of Los Angeles was pre-empted from conditioning renewal of a taxicab operating license upon the settlement of a labor dispute. 475 U. S., at 618. We reiterated the principle that a "local government . . . lacks the authority to '"introduce some standard of properly 'balanced' bargaining power" . . . or to define "what economic sanctions might be permitted negotiating parties in an 'ideal' or 'balanced' state of collective bargaining."'" *Id.,* at 619 (quoting *Machinists,* 427 U. S., at 149–150) (internal citation omitted). In *Golden State II, supra,* we determined that the taxicab employer who was challenging the city's conduct in *Golden State I* was entitled to maintain an action under 42 U. S. C. § 1983 for compensatory damages against the city. In so holding, we stated that the *Machinists* rule created a zone free from all regulations, whether state or federal. 493 U. S., at 112.

## III

When we say that the NLRA pre-empts state law, we mean that the NLRA prevents a State from regulating

within a protected zone, whether it be a zone protected and reserved for market freedom, see *Machinists*, or for NLRB jurisdiction, see *Garmon*. A State does not regulate, however, simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*.

Our decisions in this area support the distinction between government as regulator and government as proprietor. We have held consistently that the NLRA was intended to supplant state labor *regulation*, not all legitimate state activity that affects labor. In *Machinists*, for example, we referred to Congress' pre-emptive intent to "leave some activities *unregulated*," 427 U. S., at 144 (emphasis added), and held that the activities at issue—workers deciding together to refuse overtime work—were not *"regulable* by States," *id.*, at 149 (emphasis added). In *Golden State I*, we held that the reason Los Angeles could not condition renewal of a taxicab franchise upon settlement of a labor dispute was that "*Machinists* pre-emption . . . precludes state and municipal *regulation* 'concerning conduct that Congress intended to be *unregulated*.'" 475 U. S., at 614 (emphasis added) (quoting *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S., at 749). We refused to permit the city's exercise of its regulatory power of license nonrenewal to restrict Golden State's right to use lawful economic weapons in its dispute with its union. See 475 U. S., at 615–619. As petitioners point out, a very different case would have been presented had the city of Los Angeles purchased taxi services from Golden State in order to transport city employees. Brief for Petitioners 35. In that situation, if the strike had produced serious interruptions in the services the city had purchased, the city would not necessarily have been pre-empted from advising Golden State that it would hire another company if

the labor dispute were not resolved and services resumed by a specific deadline.

In *Gould*, we rejected the argument that the State was acting as proprietor rather than regulator for purposes of *Garmon* pre-emption when the State refused to do business with persons who had violated the NLRA three times within five years. We noted in doing so that *in that case*, "debarment . . . serves plainly as a means of enforcing the NLRA." 475 U. S., at 287. We said there that "[t]he State concedes, as we think it must, that the point of the statute is to deter labor law violations"; we concluded that "[n]o other purpose could credibly be ascribed." *Ibid.*

Respondents quote the following passage from *Gould*, arguing that it stands for the proposition that the State as proprietor is subject to the same pre-emption limitations as the State as regulator:

> "Nothing in the NLRA, of course, prevents private purchasers from boycotting labor law violators. But government occupies a unique position of power in our society, and its conduct, regardless of form, is rightly subject to special restraints. Outside the area of Commerce Clause jurisprudence, it is far from unusual for federal law to prohibit States from making spending decisions in ways that are permissible for private parties . . . . The NLRA, moreover, has long been understood to protect a range of conduct against state but not private interference . . . . The Act treats state action differently from private action not merely because they frequently take different forms, but also because in our system States simply are different from private parties and have a different role to play." *Id.*, at 290.

The above passage does not bear the weight that respondents would have it support. The conduct at issue in *Gould* was a state agency's attempt to compel conformity with the NLRA. Because the statute at issue in *Gould* addressed

employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to deter NLRA violations, we concluded: "Wisconsin 'simply is not functioning as a private purchaser of services,' . . . [and therefore,] for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation." *Id.*, at 289. We emphasized that we were "not say[ing] that state purchasing decisions may never be influenced by labor considerations." *Id.*, at 291.

The conceptual distinction between regulator and purchaser exists to a limited extent in the private sphere as well. A private actor, for example, can participate in a boycott of a supplier on the basis of a labor policy concern rather than a profit motive. See *id.*, at 290. The private actor under such circumstances would be attempting to "regulate" the suppliers and would not be acting as a typical proprietor. The fact that a private actor may "regulate" does not mean, of course, that the private actor may be "pre-empted" by the NLRA; the Supremacy Clause does not require pre-emption of private conduct. Private actors therefore may "regulate" as they please, as long as their conduct does not violate the law. As the above passage in *Gould* makes clear, however, States have a qualitatively different role to play from private parties. *Ibid.* When the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role, boycotts notwithstanding. Moreover, as regulator of private conduct, the State is more powerful than private parties. These distinctions are far less significant when the State acts as a market participant with no interest in setting policy.

In *Gould*, we did not address fully the implications of these distinctions. We left open the question whether a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor and its acts therefore are not "tantamount to regulation" or policymaking. As ex-

plained more fully below, we now answer this question in the affirmative.

## IV

Permitting the States to participate freely in the marketplace is not only consistent with NLRA pre-emption principles generally but also, in these cases, promotes the legislative goals that animated the passage of the §§ 8(e) and (f) exceptions for the construction industry. In 1959, Congress amended the NLRA to add § 8(f) and modify § 8(e). Section 8(f) explicitly permits employers in the construction industry—but no other employers—to enter into prehire agreements. Prehire agreements are collective-bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees. 935 F. 2d, at 356; *Jim McNeff, Inc.* v. *Todd,* 461 U. S. 260, 265–266 (1983). The 1959 amendment adding a proviso to subsection (e) permits a general contractor's prehire agreement to require an employer not to hire other contractors performing work on that particular project site unless they agree to become bound by the terms of that labor agreement. See *Woelke & Romero Framing, Inc.* v. *NLRB,* 456 U. S. 645, 657 (1982). Section 8(f) contains a final proviso that permits employees, once hired, to utilize the NLRB election process under §§ 9(c) and (e) of the Act, 29 U. S. C. §§ 159(c) and (e), if they wish to reject the bargaining representative or to cancel the union security provisions of the prehire agreement. See *NLRB* v. *Iron Workers,* 434 U. S. 335, 345 (1978).

It is undisputed that the Agreement between Kaiser and BCTC is a valid labor contract under §§ 8(e) and (f). As noted above, those sections explicitly authorize this type of contract between a union and an employer like Kaiser, which is engaged primarily in the construction industry, covering employees engaged in that industry.

Of course, the exceptions provided for the construction industry in §§ 8(e) and (f), like the prohibitions from which

they provide relief, are not made specifically applicable to the State. This is because the State is excluded from the definition of the term "employer" under the NLRA, see 29 U. S. C. § 152(2), and because the State, in any event, is acting not as an employer but as a purchaser in this case. Nevertheless, the general goals behind passage of §§ 8(e) and (f) are still relevant to determining what Congress intended with respect to the State and its relationship to the agreements authorized by these sections.

It is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a longstanding custom of prehire bargaining in the industry. See S. Rep. No. 187, 86th Cong., 1st Sess., 28, 55–56 (1959); H. R. Rep. No. 741, 86th Cong., 1st Sess., 19–20 (1959).

There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a

restriction. See, *e. g., Maryland* v. *Louisiana,* 451 U. S., at 746 ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law").[2]  Indeed, there is some force to petitioners' argument, Brief for Petitioners 25, that denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists.*

## V

In the instant case, MWRA acted on the advice of a manager hired to organize performance of a cleanup job over which, under Massachusetts law, MWRA is the proprietor. There is no question but that MWRA was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost.  As petitioners note, moreover, Brief for Petitioners 26, the challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project.  There is therefore no basis on which to distinguish the incentives at work here from those that operate elsewhere in the construction industry, incentives that this Court has recognized as legitimate.  See *Woelke & Romero Framing Co.* v. *NLRB,* 456 U. S., at 662, and n. 14.

We hold today that Bid Specification 13.1 is not government regulation and that it is therefore subject to neither *Garmon* nor *Machinists* pre-emption.  Bid Specification 13.1 constitutes proprietary conduct on the part of the Commonwealth of Massachusetts, which legally has enforced a valid project labor agreement.  As Chief Judge Breyer aptly

---

[2] Respondents suggest in their brief, Brief for Respondents 22, n. 12, that under *H. K. Porter Co.* v. *NLRB,* 397 U. S. 99, 103 (1970), § 8(d) of the NLRA expressly prohibits the conduct of MWRA at issue in this case. The Court of Appeals did not rely on this section of the statute, nor did we grant certiorari on this question.  We therefore decline the invitation to address the application, if any, of § 8(d) to Bid Specification 13.1.

noted in his dissent in the Court of Appeals, "when the MWRA, acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find, it does not 'regulate' the workings of the market forces that Congress expected to find; it exemplifies them." 935 F. 2d, at 361.

Because we find that Bid Specification 13.1 is not preempted by the NLRA, it follows that a preliminary injunction against enforcement of this bid specification was improper. We therefore reverse the judgment of the Court of Appeals and remand these cases for further proceedings consistent with this opinion.

*It is so ordered.*