HUDSON COUNTY BUILDING AND
CONSTRUCTION TRADES COUN-
CIL, AFL–CIO, Plaintiff,

v.

CITY OF JERSEY CITY, Defendant.

No. Civ. 96–1619 (DRD).

United States District Court,
D. New Jersey.

Oct. 17, 1996.

Albert G. Kroll, Kroll & Heineman, West Orange, NJ, for plaintiff Hudson County Building and Construction Trades Council, AFL–CIO.

Sean M. Connelly, Corporation Counsel by Kevin M. Brown, Assistant Corporation Counsel, Jersey City Law Dept., Jersey City, NJ, for defendant City of Jersey City.

Renee Steinhagen, Public Interest Law Center of New Jersey, Newark, NJ, for Amici Curiae, Employment Law Center, NAACP Legal Defense & Educational Fund, Inc., Public Interest Law Center of New Jersey, and Gibbons Fellowship in Public Interest and Constitutional Law of Crummy, Del Deo, Dolan, Griffinger & Vecchione.

## OPINION

DEBEVOISE, Senior District Judge.

Plaintiff Hudson County Building and Construction Trades Council, AFL–CIO ("Trades Council") seeks declaratory judgment that City Ordinance 96–022 of defendant City of Jersey City violates the Privileges and Immunities Clause, Article IV, Section 2 of the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the National Labor Relations Act, 29 U.S.C. § 151, et seq. The Trades Council moves for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, the motion for summary judgment will be denied.

## BACKGROUND

On March 13, 1996, the Jersey City Municipal Council adopted City Ordinance 96–022, an Ordinance Establishing a First Source and Affirmative Action Employment and Local Business Contracting Program. City Ordinance 96–022 was signed by the Mayor of Jersey City on March 15, 1996 and became effective on April 2, 1996. On April 9, 1996, this action was filed.

City Ordinance 96–022 mandates that recipients of economic incentives [1] from Jersey City execute a First Source and Affirmative Action Employment and Local Business Contracting Agreement ("First Source Agreement") and make a good faith effort to hire 51% Jersey City residents for construction and permanent jobs, 51% of whom are resident minorities and in non-tradition-

---

1. The term economic incentive is defined by City Ordinance 96–022 as follows:

Economic Incentive means a Recipient of any of the following economic benefits requiring the approval of the Municipal Council:

(i) a tax abatement or exemption for a property which reduces the annual amount of taxes otherwise due, by $25,000 or more in the aggregate;

(ii) any federal, state or municipal grant or loan of $25,000 or more; and/or

(iii) City property which is conveyed at a private sale for no or nominal consideration, with an actual fair market value of $25,000 or more.

City Ordinance 96–022 at ¶ 3(C).

al jobs, 6.9% of whom are resident females.[2] City Ordinance 96–022 at ¶¶ 1, 4(a). For construction jobs, good faith under City Ordinance 96–022 requires the recipient to comply with reporting requirements, to allow Jersey City access to the workplace and records and to have all contractors and subcontractors provide Jersey City with a statement that they will comply with City Ordinance 96–022 and the First Source Agreement. City Ordinance 96–022 at ¶ 5. In cases where the contractor or subcontractor has a referral agreement with a union, good faith requires submission of a statement signed by an authorized union official in which the union agrees to act consistently with the recipient's good faith obligations. *Id.*

In accordance with the provisions of the First Source Agreement, the failure of a union to sign a statement agreeing to act consistently with the recipient's good faith obligations will not excuse the recipient from compliance. First Source Agreement at ¶ VII, 2(D)(iii). If a contractor or subcontractor cannot meet the good faith obligation because of noncompliance of a trade union, it must notify Jersey City of its manpower needs and request the referral of workers consistent with the goal. First Source Agreement, Exhibit A, Mandatory Construction Contract Provisions at ¶ E(2). Once workers are referred by Jersey City, the contractor or subcontractor must consider them and if the contractor or subcontractor's work force is then consistent with the employment goals, such referred workers shall be maintained on a waiting list for first consideration in the event the work force does not meet the goals in the future. *Id.* at ¶ E(2)(b)(iii). When the practices of a union will result in a work force inconsistent with the good faith obligation, the contractor or subcontractor is required to consider workers referred by Jersey City without regard to any applicable collective bargaining agree-

ment or hiring hall arrangement it has with the union. *Id.* at ¶ E(3).

The Trades Council, with its constituent organizations, represents employees who reside in New Jersey, Pennsylvania and New York. The Trades Council negotiates collective bargaining agreements with employers in Hudson County. Such agreements usually provide for employers to recruit employees solely through the Trades Council's hiring halls which are open to all bargaining unit employees, including those from out-of-state. Employees are referred to jobs in accordance with the order by which they registered for work at the local union, regardless of their residence.

At oral argument on September 24, 1996, Kevin M. Brown, Assistant Corporate Counsel, arguing on behalf of the City of Jersey City, explained the effect of the ordinance on recipients of economic incentives who are bound by collective bargaining agreements:

> If the contractor has no leeway whatsoever to hire [Jersey City] residents because of an exclusive hiring arrangement he has with the union, there is nothing that we, the city, can do about that. We just urge that the contractor make whatever attempts it can to in good faith interview and hire Jersey City residents.

Transcript of September 24, 1996 at 8. Mr. Brown modified the City of Jersey City's position on this matter in a subsequent submission in which he asserted:

> [I]f the sole reason for not hiring a Jersey City resident is because of a (collective bargaining agreement) between its contractor (or subcontractor) and a union, a recipient may be held to have breached the First Source Agreement [the "Agreement"]. A recipient cannot claim to have acted in good faith by interviewing a Jersey City resident, if there is a contractual bar to ever hiring a resident.

Jersey City Letter Brief of October 4, 1996 at 2.

---

**2.** Neither of the parties nor the *amici curiae* addressed the issues which were the subject of *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), in which the Supreme Court held invalid a City of Richmond ordinance requiring prime construc-

tion contractors with the city to subcontract at least 30% of the dollar amount of each contract to firms that were at least 51% owned by black, Spanish-speaking, Oriental, Indian, Eskimo or Aleut citizens.

At oral argument, Mr. Brown also attempted to explain the impact of City Ordinance 96–022 on recipients of economic incentives who are not bound by collective bargaining agreements, in a situation where they have not met the 51% goal and are faced with a hiring choice between two candidates of equal skills, one a Jersey City resident and one a non Jersey City resident:

> MR. BROWN: Because given a Jersey City resident and a non Jersey City resident of equal skills, and given the fact that the developer's work force is less than 51 percent Jersey City resident, we would feel—we would believe the contractor should then hire the Jersey City resident because they have accepted their discretionary benefit from the city.
>
> THE COURT: What you're saying is he's not in good faith if he does not hire the Jersey City resident.
>
> MR. BROWN: Yes, I'm prepared to say that.

Transcript of September 24, 1996 at 19. Mr. Brown then changed his position:

> MR. BROWN: I'm sorry, I'm going to have to backtrack on that, no. The requirements—good faith is defined as interviewing, notification, disclosure. There is nothing in the ordinance that says the contractor must hire a Jersey City resident.
>
> THE COURT: So as a matter of law the ordinance requires notification, it requires interviewing when referred, but it does not require hiring the resident even though the work force of the contractor is under 51 percent.
>
> MR. BROWN: That is correct, your Honor. That is how the ordinance is written, yes.

Transcript of September 24, 1996 at 19–20. Later in the argument, Mr. Brown turned back towards his original position, noting:

> MR. BROWN: We believe that what will happen is that a developer who fails to achieve 51 percent, or let's say the developer continually turns down Jersey City residents referred to him for what we consider to be equally qualified people, as a practical matter what would most likely

happen is the next time the developer approaches the city for a subsidy we would turn them down because we feel they weren't acting, I don't want to use the word good faith, but taking that word out of the context, we would feel that they were not acting in good faith. However, I want to make it perfectly clear that I stand by what I said before. The contractor retains sole discretion to hire whomever they so choose to hire.

Transcript of September 24, 1996 at 21–22.

### *SUMMARY JUDGMENT STANDARDS*

■ An action for declaratory judgment may be decided by summary judgment pursuant to Fed.R.Civ.P. 56. Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" in question. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties, however, will not defeat an

otherwise properly supported motion for summary judgment. *Id.* at 247–248, 106 S.Ct. at 2509–2510.

## ANALYSIS

The Trades Council asserts that City Ordinance 96–022 violates the Privileges and Immunities Clause of Article IV of the United States Constitution because it impedes the fundamental right of out-of-state residents to seek private employment in New Jersey. It claims that City Ordinance 96–022 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it grants a preference to Jersey City workers over residents of other New Jersey municipalities. The Trades Council also asserts that City Ordinance 96–022 is preempted by the National Labor Relations Act, 29 U.S.C. § 151, et seq. These arguments are addressed below.

### A. PRIVILEGES AND IMMUNITIES

■ The Trades Council alleges that City Ordinance 96–022 violates the Privileges and Immunities Clause of Article IV of the United States Constitution. This clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." United States Constitution, Art. IV, § 2, cl. 1. The primary purpose of the Privileges and Immunities Clause "was to help fuse into one Nation a collection of independent, sovereign States." *Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). "[I]t was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Id.* at 396, 68 S.Ct. at 1162.

■ Evaluation of the constitutionality of a particular ordinance with respect to the Privileges and Immunities Clause is a two step process. *United Bldg. and Constr. Trades Council of Camden County and Vicinity v. Mayor of Camden,* 465 U.S. 208, 218, 104 S.Ct. 1020, 1027, 79 L.Ed.2d 249 (1984). First, the court must determine if the ordinance burdens one of the privileges and immunities "bearing upon the vitality of the Nation as a single entity," for the state must treat all citizens equally only with regard to such privileges and immunities. *Baldwin v. Fish and Game Comm'n of Montana,* 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354 (1978). If the burdened privileges and immunities are protected by the clause, the court must then determine whether there are substantial reasons for the difference in treatment and if such reasons exist, whether the "degree of discrimination bears a close relation to them." *Toomer,* 334 U.S. at 396, 68 S.Ct. at 1162.

■ In accordance with *Toomer,* the substantial reasons for the difference in treatment must include a finding that "non-citizens constitute a peculiar source of the evil at which the statute is aimed." *Id.* at 398, 68 S.Ct. at 1163. "States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." *Id.* at 396, 68 S.Ct. at 1162. The *amici curiae* assert that the "peculiar source of the evil" standard is no longer relevant in light of the Supreme Court's decision in *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985). After the *Piper* decision, however, the Court of Appeals for the Third Circuit continued to use the "peculiar source of the evil" test; thus, the test is binding upon this court. *Salem Blue Collar Workers Ass'n v. City of Salem,* 33 F.3d 265, 270 n. 6 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995).

■ In the instant case, the Trades Council asserts that City Ordinance 96–022 interferes with the fundamental right of workers from other states to pursue private employment. The right to pursue a common calling is clearly fundamental for purposes of protection by the Privileges and Immunities Clause. *Camden,* 465 U.S. at 219, 104 S.Ct. at 1028. Jersey City asserts that City Ordinance 96–022 does not prevent out-of-state workers from seeking employment with contractors and subcontractors who have received an economic benefit from it because the ordinance only requires contractors to interview and consider Jersey City residents.

The Trades Council contends that City Ordinance 96–022 is similar to the ordinance at issue in *Camden*. *Id.* at 213, 104 S.Ct. at 1024. In *Camden*, the Court evaluated the constitutionality under the Privileges and Immunities Clause of a Camden ordinance requiring that contractors and subcontractors working on construction projects funded in whole or in part with funds which Camden expends or administers in accordance with the terms of a grant make every good faith effort to comply with a goal of hiring 40% Camden residents. *Id.* The Court found that Camden's ordinance discriminates against a protected privilege under the Privileges and Immunities Clause, "[t]he opportunity to seek employment with such private employers." *Id.* at 221, 104 S.Ct. at 1029.

Jersey City asserts that instead this case is similar to *International Organization of Masters, Mates and Pilots v. Andrews*, 831 F.2d 843 (9th Cir.1987), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988). In that case, the Court of Appeals for the Ninth Circuit examined the constitutionality of an Alaska statute which required that "every labor agreement between public employers in Alaska and any labor organization provide that wages of nonresident employees not increase until the difference between wages paid to residents and wages paid to nonresidents 'reflects the difference between the cost of living in Alaska and living in Seattle, Washington.' " *Id.* at 844–45. The court found that the Alaska statute does not impose on a privilege or immunity fundamental to the promotion of interstate harmony. *Id.* at 845–46. It noted that it need not decide whether public employment is subject to the requirements of the Privileges and Immunities Clause because in this case, the statute does not prevent or discourage out-of-state employees from seeking public employment. *Id.* at 846. The statute was valid regardless, because it did not "limit the number of nonresident workers, favor the hiring of Alaska workers, or make employment with AMHS unprofitable for nonresidents." *Id.* (citations omitted).

The Court of Appeals for the Third Circuit later distinguished direct public employment from employment with private employers on public works projects as seen in the *Camden* case. *Salem*, 33 F.3d at 269–70. The court found that while indirect public employment is a fundamental privilege in accordance with *Camden*, the Privileges and Immunities Clause does not apply to direct public employment. *Id.* This is because there is no privilege or fundamental right to direct employment with a governmental institution. *Id.*

City Ordinance 96–022 is almost identical to the ordinance at question in *Camden*. *See* 465 U.S. at 213, 104 S.Ct. at 1024. The conditions imposed on recipients of economic incentives by Jersey City to make a good faith effort to hire 51% Jersey city residents transcend mere interviewing requirements. In effect, the good faith requirement of Jersey City Ordinance 96–022 mandates that residents with the same skills and qualifications as out-of-state workers be given first consideration for positions with recipients of economic incentives and their contractors and subcontractors. The requirement of making a good faith effort to hire Jersey City residents is inconsistent with the recipient and its contractors and subcontractors being free to hire whomever they choose. Thus, City Ordinance 96–022 burdens the opportunity of out-of-state residents to seek employment with such private employers, a privilege protected by the Privileges and Immunities Clause.

■ Next, it is necessary to inquire whether City Ordinance 96–022 bears a close relation to a substantial reason for the difference in treatment and whether the actions of nonresidents are a source of the evil which the ordinance combats. Jersey City asserts that its legitimate interest in promoting the general welfare of its citizens against high rates of poverty and unemployment is a substantial reason for discrimination against out-of-state residents. Jersey City sets forth information gathered by a telephone interview with the New Jersey Department of Labor, Labor Research and Analysis providing that its 1995 annualized unemployment rate was 11.5% compared to a rate for Hudson County of 9.3% and a rate for the State of New Jersey of 6.4%. Poverty levels are also higher in Jersey City than in the sur-

rounding area as reflected in the New Jersey Department of Labor 1990 Data Census, showing 18.9% of Jersey City residents were below the poverty level compared with 14.8% of people in Hudson County.

Jersey City further claims that City Ordinance 96–022 bears a close relation to its interest in promoting the economic welfare of its residents. City Ordinance 96–022 provides a means for referral of unemployed and underemployed Jersey City residents to contractors and subcontractors who are in a position to hire them. It asserts that mandatory consideration of its residents will not truly harm non-residents, as contractors and subcontractors who have received economic incentives are still free to interview and hire them.

Jersey City has demonstrated its problems with unemployment and poverty, but it has not shown that out-of-state workers are a source of unemployment and poverty within its borders. It is unlikely that Jersey City can make such a showing. Summary judgment is not appropriate at this juncture, because issues of justification remain. In analyzing summary judgment motions, all justifiable inferences are to be drawn in favor of the non-movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

## B. EQUAL PROTECTION

The Trades Council alternatively asserts that City Ordinance 96–022 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. This clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." United States Constitution, Amend. XIV, § 1. The Trades Council asserts that City Ordinance 96–022 improperly discriminates in favor of Jersey City residents and against non-residents.

■ For purposes of the Fourteenth Amendment's Equal Protection Clause, the first inquiry is whether the legislation "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). If strict scrutiny is required, the state must demonstrate that the statute at issue is narrowly tailored to serve legitimate objectives and it is the least restrictive means of accomplishing these objectives. *Id.* If no suspect class or fundamental right is involved, however, the statute at issue is evaluated under a rational relationship test, and it is valid if "it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." *Id.* Under this standard, "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

■ The Trades Council suggests that a fundamental right to private employment in public and private works projects is implicated in this case. The pursuit of a common calling is a fundamental privilege for purposes of the Privileges and Immunities Clause of the United States Constitution. *Camden*, 465 U.S. at 219, 104 S.Ct. at 1028. However, analysis of fundamental rights for purposes of the Privileges and Immunities Clause is not the same as analysis under the Equal Protection Clause. *Oklahoma Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n*, 889 F.2d 929, 932 (10th Cir. 1989). For purposes of the Equal Protection Clause, a fundamental right is one "explicitly or implicitly guaranteed by the Constitution." *San Antonio Indep. Sch. Dist.*, 411 U.S. at 33, 93 S.Ct. at 1296. "[I]n the equal protection clause context, the Supreme Court has never recognized a fundamental right to pursue a particular line of employment." *Oklahoma Educ. Ass'n*, 889 F.2d at 932.

■ City Ordinance 96–022 affects private employment on public work projects, projects funded to the extent of $25,000 by economic benefits requiring the approval of the Municipal Council. The Constitution does not explicitly or implicitly guarantee private employment on public works projects.

Thus, no fundamental right is implicated in this case.

■ In addition, non-residents do not constitute a suspect class. *Baldwin,* 436 U.S. at 389, 98 S.Ct. at 1863. A suspect class is one which is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist.,* 411 U.S. at 28, 93 S.Ct. at 1294. Non-residents of Jersey City are not disabled, historically discriminated against or politically powerless.

■ Because no fundamental right or suspect class is implicated, the proper test is whether City Ordinance 96–022 rationally furthers a legitimate state purpose. *See id.* at 17, 93 S.Ct. at 1288. Jersey City asserts that in enacting City Ordinance 96–022, its goal was to reduce unemployment among its residents. A factual question exists as to whether such a legitimate governmental interest is rationally furthered by the provisions of City Ordinance 96–022. Thus, summary judgment on the Trades Council's equal protection argument is inappropriate.

The Trades Council has referred the court to the case of *Alaska v. Enserch Alaska Construction, Inc.,* 787 P.2d 624 (Alaska 1989) in support of its contention that the Equal Protection Clause is violated by City Ordinance 96–022. In that case, the Supreme Court of Alaska interpreted the constitutionality of an Alaska statute providing a hiring preference on public works projects to residents of economically distressed zones. *Id.* at 631–35. The court found that the statute violated Alaska's equal protection clause. *Id.*

Analysis under Alaska's equal protection clause requires a sliding scale approach which "often provides greater protection to individual rights" than the tiered approach used under the federal constitution. *Id.* at 631. The Supreme Court of Alaska opined that "[w]hile the right to earn a living is not a fundamental right under the federal equal protection clause, we have noted that the right to engage in an economic endeavor

within a particular industry is an 'important' right for state equal protection purposes." *Id.* at 632. Accordingly, this interpretation of the constitutionality of an Alaska statute in accordance with the Alaska equal protection clause is inapplicable to the case at hand.

## C. PREEMPTION

■ The Trades Council asserts that City ordinance 96–022 is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, et seq. There is no statutory preemption provision contained within the NLRA. *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985). It is the court's duty to determine the preemptive scheme intended by Congress. *Id.* This analysis starts with the basic assumption that Congress did not intend to preempt state law, and local regulations are preempted only where they conflict with the federal law, would frustrate the scheme behind the enactment of the federal law or the totality of the circumstances indicates that Congress intended to occupy the relevant field and completely exclude state legislation. *Id.; Building and Constr. Trades Council of the Metro. Dist. v. Associated Builders and Contractors of Massachusetts,* 507 U.S. 218, 223, 113 S.Ct. 1190, 1193, 122 L.Ed.2d 565 (1993).

■ The Supreme Court has set forth two lines of preemption doctrine pursuant to the NLRA. *Metropolitan Life Ins. Co.,* 471 U.S. at 748, 105 S.Ct. at 2393. The first line of preemption, "Garmon preemption," is based on the premise that the National Labor Relations Board possesses primary jurisdiction over the determination of "whether the particular activity regulated by the States was governed by § 7 or § 8 [of the NLRA] or was, perhaps, outside both these sections." *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244–45, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959). Thus, "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." *Id.* at 244, 79 S.Ct. at

779. "*Garmon* pre-emption prohibits regulation of activities that the NLRA only *arguably* protects or prohibits." *Building and Constr. Trades Council of the Metro. Dist.*, 507 U.S. at 225, 113 S.Ct. at 1194.

The second line of preemption, "*Machinists* preemption," arose because Congress intended certain conduct to be "controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976) (citing *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971)). *Machinists* preemption "protects against state interference with the policies implicated by the structure of the [NLRA] itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated." *Metropolitan Life Ins. Co.*, 471 U.S. at 749, 105 S.Ct. at 2394. This doctrine was initially designed "to govern pre-emption questions that arose concerning activity that was neither arguably protected against employer interference by §§ 7 and 8(a) of the NLRA, nor arguably prohibited as an unfair labor practice by § 8(b) of that Act." *Id.*

■■■ The Trades Council asserts that City Ordinance 96–022 is preempted by both *Garmon* preemption and *Machinists* preemption. A threshold question to preemption under either analysis, however, is whether Jersey City acted as a market regulator or as a market participant, because state actions as a market participant are not preempted by the NLRA. *Building and Constr. Trades Council of the Metro. Dist.*, 507 U.S. at 226–27, 113 S.Ct. at 1196. In this regard, the Supreme Court noted that:

> When we say that the NLRA pre-empts state law, we mean that the NLRA prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, see *Machinists*, or for NLRB jurisdiction, see *Garmon*. A State does not regulate, however, simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in

the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*.

*Id.* State conduct as a proprietor which is tantamount to regulation or policy making is conduct as a market regulator, not as a market participant. *Id.* at 227–28, 113 S.Ct. at 1196–97; see *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 287–90, 106 S.Ct. 1057, 1061–63, 89 L.Ed.2d 223 (1986). State action as a proprietor is legitimate market participation in situations where the statute is "a legitimate response to state procurement constraints or to local economic needs" or a legitimate attempt to pursue "a task Congress intended to leave to the States." *Id.* at 291, 106 S.Ct. at 1064. The state's conduct as a proprietor is illegitimate market regulation when "the manifest purpose and inevitable effect of the [statute] is to enforce the requirements of the NLRA." *Id.*

■■ In this case, Jersey City is not interacting in the market as the owner or manager of property. Any participation of Jersey City in the market pursuant to City Ordinance 96–022 is tantamount to regulation. Consequently, in enacting and enforcing the requirements of City Ordinance 96–022, Jersey City is acting as a market regulator, and it is necessary to determine the applicability of *Garmon* preemption and *Machinists* preemption to the present set of facts and circumstances.

■■ The Trades Council asserts that City Ordinance 96–022 is subject to *Garmon* preemption because it regulates hiring hall procedures designated in collective bargaining agreements. In accordance with section 8(a)(5) of the NLRA, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(5). "[A]n employer violates his § 8(a)(5) duty to bargain in good faith if he unilaterally changes the terms of a collective agreement." *NLRB v. Southwest Security Equip. Corp.*, 736 F.2d 1332, 1337 (9th Cir. 1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1854, 85 L.Ed.2d 151 (1985). Jersey City

responds that City Ordinance 96–022 does not force the union to change or modify its hiring hall procedures.

The Trades Council alternatively argues that City Ordinance 96–022 is subject to *Machinists* preemption, because hiring hall provisions, a mandatory subject of negotiations, have been left to a free play of economic forces in the private sector. However, the "fact that a state statute pertains to matters over which the parties are free to bargain" is not enough alone to support a claim of *Machinists* preemption. *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 21, 107 S.Ct. 2211, 2222, 96 L.Ed.2d 1 (1987). As noted by the curiae, *Machinists* preemption, like *Garmon* preemption, focuses upon the collective bargaining process, not on the substantive results of that process. *See Metropolitan Life Ins. Co.,* 471 U.S. at 749, 753, 105 S.Ct. at 2394, 2396; *Machinists,* 427 U.S. at 140, 96 S.Ct. at 2553.

The issue of whether the provisions of City Ordinance 96–022 are preempted by either *Garmon* preemption or *Machinists* preemption is not amenable to summary judgment, as questions of material fact remain. For instance, the issue of *Garmon* preemption depends upon the factual question of whether and how City Ordinance 96–022 regulates the collective bargaining process. The factual question of whether City Ordinance 96–022 affects conduct of unions and employers in the collective bargaining process similarly precludes summary judgment on the issue of *Machinists* preemption.

Finally, the Trades Council looks to another preemption doctrine and asserts that City Ordinance 96–022 is preempted by section 301 of the Labor Management Relations Act. 29 U.S.C. § 185(a). Section 301 provides that:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). It is necessary to determine whether City Ordinance 96–022 frustrates the federal labor-contract scheme of section 301. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 209, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985).

The Supreme Court has interpreted section 301 "not only to grant federal courts jurisdiction over claims asserting breach of collective-bargaining agreements but also to authorize the development of federal common-law rules of decision." *Livadas v. Bradshaw,* 512 U.S. 107, 121, 114 S.Ct. 2068, 2077, 129 L.Ed.2d 93, 108 (1994). A major reason for this development of federal common law is to ensure the enforcement of agreements to arbitrate grievances, regardless of "the vagaries of state law and lingering hostility toward extrajudicial dispute resolution." 512 U.S. at 122, 114 S.Ct. at 2077, 129 L.Ed.2d at 108; *Textile Workers Union of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The outer limits of preemption under section 301 were set forth by the Court in *Livadas:*

[T]he pre-emption rule has been applied only to assure that the purposes animating § 301 will be frustrated neither by state laws purporting to determine "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement," nor by parties' efforts to renege on their arbitration promises by "relabeling" as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements.

512 U.S. at 122–23, 114 S.Ct. at 2077, 129 L.Ed.2d at 109 (citation omitted). If the state law claim depends upon an interpretation of the meaning of a collective bargaining agreement, state law is preempted and federal labor law principles control. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405–06, 108 S.Ct. 1877, 1881–82, 100 L.Ed.2d 410 (1988).

The Trades Council asserts that the regulation of referral and hiring hall procedures of City Ordinance 96–022 is dependent

upon the interpretation of collective bargaining agreements. However, examination of collective bargaining agreements is unnecessary for the enforcement of City Ordinance 96–022. Further, City Ordinance 96–022 does not attempt to interpret any collective bargaining agreement and has no effect on arbitration regarding the terms of any collective bargaining agreement. Thus, City Ordinance 96–022 is not preempted by section 301 of the Labor Management Relations Act.

### CONCLUSION

For the foregoing reasons, the Trades Council's motion for summary judgment is denied. An appropriate order follows.