# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 7, 2013            Decided July 5, 2013

No. 11-7155

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA, AFL-CIO AND SOUTHWEST REGIONAL COUNCIL OF
CARPENTERS,
APPELLANTS

v.

OPERATIVE PLASTERERS' & CEMENT MASONS'
INTERNATIONAL ASSOCIATION OF THE UNITED STATES &
CANADA, AFL-CIO,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00353)

———

No. 11-7161

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA, AFL-CIO AND SOUTHWEST REGIONAL COUNCIL OF
CARPENTERS,
APPELLANTS

v.

OPERATIVE PLASTERERS' & CEMENT MASONS'
INTERNATIONAL ASSOCIATION OF THE UNITED STATES &
CANADA, AFL-CIO,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-02212)

———

*Alice Chih-Mei Chen* argued the cause for the appellants.
*Daniel M. Shanley* was on brief.

*Keith R. Bolek* argued the cause for the appellee. *Brian A. Powers* was on brief.

*Robert D. Kurnick* and *Richard M. Resnick* were on brief for *amici curiae* Building and Construction Trades Department, et al. in support of the appellee.

Before: HENDERSON and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In unconsolidated cases Nos. 11-7155 and 11-7161, two unions—the United Brotherhood of Carpenters and Joiners of America (UBCJA) and one of its locals, the Southwest Regional Council of Carpenters (SWRCC) (collectively, Carpenters)—appeal the district court's confirmation of two arbitration awards in favor of a third union, the Operative Plasterers' and Cement Masons' International Association (Plasterers). In addition to pressing their merits arguments, the Carpenters contend that the cases are moot and request

vacatur of the district court judgments on either basis. Concluding that we have jurisdiction, we affirm the district court's grants of summary judgment to the Plasterers.

## I.    Background

In 1997, voters in the Los Angeles Unified School District (LAUSD) approved funding for a massive capital improvement program involving both the renovation of existing facilities and the construction of new ones (LAUSD Program).  In May 2003, the LAUSD executed a project labor agreement (PLA)—the Project Stabilization Agreement (PSA or Agreement)—with the Los Angeles/Orange Counties Building and Construction Trades Council (LACTC) and the local chapters of several unions in order to stabilize labor relations on LAUSD Program construction sites. *See infra* Part IV.A (discussing PLAs).    The SWRCC and the Plasterers' Local 200 (Local 200)—the Plasterers' local chapter—are both parties to the Agreement.  The Agreement provides that all contractors and subcontractors awarded work by the LAUSD must accept the Agreement's terms and must "evidence their acceptance by the execution of . . . [a] Letter of Assent." PSA § 2.5(b), Joint Appendix at 253, *United Bhd. of Carpenters & Joiners v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, No. 11-7155 (*Frye* JA).  Contractors and subcontractors awarded work pursuant to the Agreement must recognize "the [LACTC] and the signatory local Unions as the exclusive bargaining representative for the employees engaged in Project Work" for "the period when the employee[s are] engaged in Project Work." *Id.* § 3.1, *Frye* JA 256.

Under the Agreement, the contractors are exclusively responsible for assigning work to particular employees.  But given that more than thirty locals and dozens of contractors and subcontractors are parties to the Agreement, opportunities

for conflict over which employees should perform what work abound. A conflict "between two or more groups of employees over which is entitled to do work for an employer" is known as a "jurisdictional dispute." *NLRB v. Radio & Television Broad. Eng'rs Union, Local 1212*, 364 U.S. 573, 579 (1961) (*CBS*). Section 10(k) of the National Labor Relations Act (NLRA), 29 U.S.C. 160(k), authorizes the National Labor Relations Board (Board) to decide a jurisdictional dispute if it arises as part of an unfair labor practice charge under section 8(b)(4)(D), *Int'l Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407, 1409 (D.C. Cir. 1989) (*Sea-Land*), unless "the parties to such dispute . . . agree[] upon methods for the voluntary adjustment of[] the dispute," 29 U.S.C. § 160(k); *see also Ga.-Pac. Corp. v. NLRB*, 892 F.2d 130, 132 (D.C. Cir. 1989) ("National labor policy favors the private settlement of jurisdictional disputes between two unions.").

The Agreement contains a jurisdictional dispute resolution provision declaring that "[a]ll jurisdictional disputes between or among Building and Construction Trades Unions party to th[e] Agreement[] shall be settled and adjusted according to the" Plan for the Settlement of Jurisdictional Disputes in the Construction Industry (Plan). PSA § 8.2, *Frye* JA 272. Established in 1948 by the Building and Construction Trades Department of the AFL-CIO, the Plan is an arbitration mechanism the courts and the Board have long recognized as an adequate jurisdictional dispute resolution method under section 10(k). *See NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116, 120 n.5 (1971); *Heavy Constr. Laborers' Local 60*, 305 N.L.R.B. 762, 763 (1991). All decisions rendered pursuant to the Plan are "final, binding and conclusive on the contractors and Union parties to" the Agreement, PSA § 8.2, *Frye* JA 272, and all

employers must make work assignments "in accordance with the Plan," *id.* § 8.1, *Frye* JA 272.

### A. Arbitration Awards in No. 11-7161 and No. 11-7155

On June 30, 2009, the Board certified the SWRCC as the exclusive bargaining representative of the construction employees of Jordan Interiors, Inc. (Jordan). At some point in 2009, Clark Construction Group, LLC subcontracted with Jordan to perform plastering work at the Central Region Middle School No. 7 Project (No. 7 Project) and Jordan became a party to the Agreement. After learning that Jordan intended to assign the work to its own SWRCC-represented employees, the Plasterers filed a complaint with the Plan Administrator claiming that the plastering work at the No. 7 Project fell within Local 200's jurisdiction.[1] The UBCJA (on behalf of its local, the SWRCC) refused to participate in the Plan arbitration, arguing that the Board's then-recent certification of the SWRCC as the exclusive bargaining representative of Jordan's construction employees ousted the arbitrator of authority to arbitrate the dispute. On November 10, 2009, Plan arbitrator Tony A. Kelly determined that the plastering work at the No. 7 Project belonged to the Plasterers (Kelly Award).

In 2010, S.J. Amaroso Construction (Amaroso) subcontracted with Frye Construction, Inc. (Frye)[2] to perform plastering work at the South Region Elementary School No. 11 Project (No. 11 Project) and Frye thereafter became a party to the Agreement either in 2010 or 2011. Frye assigned the

---

[1] The Plasterers brought the complaint because the Plan requires that national and international unions arbitrate disputes on their locals' behalf.

[2] We refer to Frye and Jordan collectively as the Employers.

work to its own employees, who were represented by the SWRCC. The Plasterers filed a complaint pursuant to the Plan alleging that the plastering work at the No. 11 Project fell within Local 200's jurisdiction. While the complaint was pending, on February 2, 2011, the Board certified SWRCC as the exclusive bargaining representative of the bargaining unit consisting of all of Frye's construction employees. Before arbitrator Thomas G. Pagan, the UBCJA (again, on behalf of the SWRCC) argued that Pagan lacked authority to arbitrate. On February 7, 2011, Pagan determined that the plastering work at the No. 11 Project also belonged to the Plasterers (Pagan Award).[3]

## B. District Court Proceedings

The Carpenters petitioned the district court to vacate the Kelly Award and the Plasterers counterclaimed to confirm it. The district court granted summary judgment to the Carpenters and vacated the Kelly Award. *Operative Plasterers' & Cement Masons' Int'l Ass'n v. Jordan Interiors, Inc.*, 744 F. Supp. 2d 49 (D.D.C. 2010) (*Jordan Interiors I*). It concluded that Jordan became a party to the Agreement on January 20, 2009. *Id.* at 52. Because the June 30, 2009 Board certification of the SWRCC postdated Jordan's entry into the Agreement, the court reasoned that the certification effectively terminated the contractual relationship between Jordan and Local 200, thereby stripping the arbitrator of authority to arbitrate the jurisdictional dispute. *Id.* at 57. The Plasterers timely appealed.

While their appeal was pending, the Plasterers also moved before the district court under Federal Rule of Civil Procedure 60(b)(1), seeking relief from the summary

---

[3] Beginning in Part II, we refer to the Pagan Award in *Frye* and the Kelly Award in *Jordan* collectively as the Awards.

judgment grant against them. They argued that, although the district court correctly determined that Jordan became a party to the Agreement in January 2009 on a different project, it did not become a party as to the No. 7 Project until October 2009. Because Jordan joined the Agreement *after* the Board's June 30, 2009 section 9(a) certification, the certification could not have terminated the Agreement with respect to Jordan and Local 200. The district court agreed and entered an order notifying this Court that, were the case remanded, the district court would grant the Plasterers' Rule 60(b) motion. We remanded; the district court then granted the Plasterers' motion, vacated its summary judgment grant to the Carpenters and granted summary judgment to the Plasterers, thereby confirming the Kelly Award. *Operative Plasterers' & Cement Masons' Int'l Ass'n v. Jordan Interiors, Inc.*, 826 F. Supp. 2d 241, 242–43 n.1, 247–48 (D.D.C. 2011) (*Jordan Interiors II*). The Carpenters timely appealed.

The Carpenters also petitioned the district court to vacate the Pagan Award and the Plasterers counterclaimed for enforcement. The district court granted summary judgment to the Plasterers, thus confirming the arbitration award. *United Bhd. of Carpenters & Joiners v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 826 F. Supp. 2d 209, 221 (D.D.C. 2011) (*Frye*). The Carpenters timely appealed.

## II. Mootness

The district court's statutory jurisdiction to enforce the Awards arises under 29 U.S.C. § 185(a), (c), *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers*, 47 F.3d 14, 16 (2d Cir. 1995), and we have statutory jurisdiction under 28 U.S.C. § 1291. Our constitutional jurisdiction, however, is not so clear. *See Mayor of Nashville v. Cooper*, 73 U.S. (6 Wall.) 247, 252 (1867) (court must have statutory and constitutional jurisdiction to hear case). Given that many

months had passed between the dates the Employers first assigned the work pursuant to the PLA and the perfecting of these appeals, at oral argument we ordered the parties to brief whether these cases had become moot. The briefs revealed that both the No. 7 and No. 11 Projects are complete. In light of that fact, the Carpenters now contend that the cases are moot and ask that we vacate the district court judgments on that basis. The Plasterers argue that we have jurisdiction under the "capable of repetition but evading review" exception to the Article III mootness doctrine.

"Article III, Section 2 of the Constitution permits federal courts to adjudicate only actual, ongoing controversies." *McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 55 (D.C. Cir. 2001) (quotation marks omitted); *see also Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013). A case remains live "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (quotation marks omitted). The case must remain live "at all stages of review, not merely at the time the complaint is filed." *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *see also Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990). "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).

In *National Football League Players Association v. Pro Football, Inc.*, the labor arbitrator ordered the employer to suspend delinquent employees before the end of the professional football season. 56 F.3d 1525, 1527 (D.C. Cir. 1995), *vacated in other part on reh'g*, 79 F.3d 1215 (D.C. Cir. 1996). The employer refused to comply and the union sought

enforcement of the arbitration award; the professional football season ended, however, before we heard the appeal. *Id.* at 1528. We held that the enforcement action was moot because an order mandating compliance with the arbitrator's award—which required action before the season's end—would be wholly ineffectual as the season had ended. *Id.* at 1529. Similarly here, vacatur of the arbitration awards would provide the Carpenters no relief because the plastering work to which vacatur would entitle them no longer exists.

These cases are therefore moot unless the "capable of repetition but evading review" exception applies. The exception applies if " '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.' " *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)); *see also S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911) (announcing exception). The party invoking the exception bears the burden of showing that both elements are satisfied. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009).

We examine the "evading review" prong first. To evade review, the challenged action must be incapable of surviving long enough to undergo Supreme Court review. *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 369 (D.C. Cir. 1992). Recent census data reveals that educational construction projects like the No. 7 and No. 11 Projects typically last no longer than approximately two years—and therefore individual work assignments on those projects last for even shorter periods. U.S. CENSUS BUREAU, *Table 2: Average Number of Months from Start to Completion for State and Local Construction Projects Completed in 2010–2011, by Value and Type of*

*Construction* (2011), *available at* http://www.census.gov/
construction/c30/pdf/t211.pdf. In light of the "rule-of-thumb"
that "orders of less than two years' duration ordinarily evade
review," the Awards comfortably satisfy the "evading review"
prong. *LaRouche v. Fowler*, 152 F.3d 974, 978 (D.C. Cir.
1998). Moreover, in the "quintessential jurisdictional
dispute" the employer is neutral as to which group of
employees should perform the work. *Int'l Longshoremen's &
Warehousemen's Union, Local 14 v. NLRB*, 85 F.3d 646, 652
(D.C. Cir. 1996) (*Sierra Pacific*); *see also CBS*, 364 U.S. at
579 ("[I]n most instances, [the quarrel] is of so little interest
to the employer that he seems perfectly willing to assign work
to either [group of employees] if the other will just let him
alone."). A delay in the completion of a particular work
assignment can postpone the completion of an entire
construction project and jeopardize the employer's ability to
obtain future contracts. It therefore has good reason to
comply quickly with an arbitration award and complete a
given work assignment notwithstanding an unresolved
judicial challenge to the award. Because the judiciary is
ordinarily unable to keep pace with the employer's need to
complete the work assignment, the Awards are "by [their]
very nature short in duration, so that [they] could not, or
probably would not, be able to be adjudicated while fully
live." *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C. Cir.
1985) (quotation marks and emphases omitted).

Whether the disputes are "capable of repetition" is a
closer question. "This prong requires that the same parties
will engage in litigation over the same issues in the future."
*Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 633
(D.C. Cir. 2002). The party invoking the exception must
show "a reasonable degree of likelihood that the issue will be
the basis of a continuing controversy between the[] two
parties." *Id.* (quotation marks and brackets omitted). The

relevant inquiry, however, is not "whether the precise historical facts that spawned the plaintiff's claims are likely to recur." *Del Monte*, 570 F.3d at 324. Rather, "[t]he 'wrong' that is, or is not, 'capable of repetition' must be defined in terms of the precise controversy it spawns," to wit, "in terms of the legal questions it presents for decision." *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 396 F.3d 416, 422–23 (D.C. Cir. 2005).

Here, the alleged "wrong" is the Carpenters' loss of work caused by the award of the work to a different union pursuant to a standard arbitration provision in a PLA. The question, then, is whether the Carpenters are reasonably likely to suffer this legal wrong again. "In estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990) (en banc). Because the parties have already arbitrated three jurisdictional disputes arising under the Agreement, which continues to govern all construction work awarded before its September 30, 2013 expiration, it is not unreasonable to expect another dispute to arise between them before the Agreement expires.

But we do not confine our inquiry to disputes arising under the Agreement. Admittedly, in reviewing an arbitration award, we are reviewing the interpretation of the particular terms of a particular contract. *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1475 (D.C. Cir. 1997). In an ordinary contract dispute, the uniqueness of those terms might make the case so "highly fact-specific" that it would not likely recur. *Gittens*, 396 F.3d at 424. Here, however, the terms of the Agreement are hardly unique. As the *amici* point out, the Plan is incorporated into hundreds of PLAs worth tens of billions of dollars. And the Agreement's recognition clause—the only specific clause on which the Carpenters base their arguments—is a common provision in PLAs. *See Bldg. Indus.*

*Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 186 (2d Cir. 2012) (*BIECA*).[4]    Indeed, numerous jurisdictional disputes have arisen between these parties under other PLAs. *See, e.g.*, *Sw. Reg'l Council of Carpenters*, 348 N.L.R.B. 1250, 1252 (2006) (*Standard Drywall II*) (resolving jurisdictional disputes between SWRCC and Local 200 at ninety-seven job sites, including three covered by PSA); *Sw. Reg'l Council of Carpenters*, 346 N.L.R.B. 478, 478 (2006) (*Standard Drywall I*) (resolving jurisdiction dispute between SWRCC and Local 200 at educational construction site). Granted, those disputes did not result in arbitration. But given the ubiquity of the Plan in PLAs and the frequency of jurisdictional clashes involving the Carpenters and the Plasterers, future arbitrable jurisdictional disputes raising the same legal issue between them seem reasonably likely to

---

[4] *Compare also* PSA § 3.1, *Frye* JA 256 ("The Contractor recognizes the Council and the signatory local Unions as the exclusive bargaining representative for the employees engaged in Project Work.  Such recognition does not extend beyond the period when the employee is engaged in Project Work."), *with* BLDG. & CONSTR. TRADES DEP'T, AFL-CIO, STANDARD PROJECT LABOR AGREEMENT art. III, § 1, *available at* http://www.bctd.org/Field-Services/Project-Labor-Agreement.aspx ("The Contractors recognize the signatory Unions as the sole and exclusive bargaining representatives of all craft employees within their respective jurisdictions working on the Project within the scope of this Agreement."), *and* NEW YORK CITY DEP'T OF DESIGN & CONSTR., PROJECT LABOR AGREEMENT COVERING NEW CONSTRUCTION OF IDENTIFIED CITY OWNED BUILDINGS & STRUCTURES art. 4, § 1, *available at* http://www.nyc.gov/html/mocs/downloads/pdf/pla/PLA%20DDC%20New%20Construction.PDF ("The Contractors recognize the signatory Unions as the sole and exclusive bargaining representatives of all employees who are performing on-site Program Work, with respect to that work.").

occur. These cases, then, are not moot and we proceed to the merits.

### III.   *Procedural Issues*

Although the Carpenters' merits arguments are, in the main, identical in both cases, each appeal presents unique procedural arguments which we address first.

#### A.  *No. 11-7161 (Jordan Interiors I and II)*

The Carpenters argue that the district court erred in granting the Plasterers' Rule 60(b)(1) motion in *Jordan Interiors II* and further erred in denying its motion to consolidate *Jordan Interiors II* and *Frye* or, in the alternative, in not allowing rebriefing of the issues presented in *Jordan Interiors II*. We review the grant of a Rule 60(b) motion, the denial of a motion for consolidation and the denial of a motion for further briefing for abuse of discretion. *See Randall v. Merrill Lynch*, 820 F.2d 1317, 1320 (D.C. Cir. 1987) (Rule 60(b)); *Moten v. Bricklayers, Masons & Plasterers Int'l Union*, 543 F.2d 224, 228 n.8 (D.C. Cir. 1976) (consolidation); *Asemani v. Islamic Republic of Iran*, 167 Fed. App'x 806, 806 (D.C. Cir. 2005) (briefing).

Designed to strike a balance between finality and the demands of justice, *see Smalls v. United States*, 471 F.3d 186, 191 (D.C. Cir. 2006), Rule 60(b) authorizes the district court to "relieve a party . . . from a final judgment . . . for . . . mistake, inadvertence, surprise, or excusable neglect," so long as the motion is filed within "a year after entry of the judgment." FED. R. CIV. P. 60(b)(1), (c)(1). The Carpenters claim that granting the Rule 60(b) motion was error because

the Plasterers' failure to press their date-based "defense"[5] before *Jordan Interiors I* issued was strategic and therefore not excusable. Br. of Appellants 50, *United Bhd. of Carpenters & Joiners v. Operative Plasterers' and Cement Masons' Int'l Ass'n*, No. 11-7166 (*Jordan* Br. of Appellants). The Carpenters thus do not challenge the district court's determination that *Jordan Interiors I* was premised on a factual error but instead argue that the Plasterers are responsible for that error. But the Plasterers referred specifically to the October 22, 2009 Letter of Assent in multiple district-court filings. The district court nevertheless missed the references and, realizing its mistake, sought to correct *Jordan Interiors I* by granting the Plasterers' motion. Even if the Carpenters were correct in their reading of the record below, the district court did not err in granting the motion. *See Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980) ("When a party timely presents a previously undisclosed fact so central to the litigation that it shows the initial judgment to have been manifestly unjust, reconsideration under rule 60(b)[(1)] is proper even though the original failure to present that information was inexcusable."). Given that *Jordan Interiors I* turned on the district court's mistaken understanding of the record and that the Plasterers complied with the timing requirement of Rule 60(c), the district court did not abuse its discretion in granting the motion.

The district court denied the Carpenters' motion for consolidation or additional briefing because it concluded that "the parties previously had ample opportunity to make arguments concerning" the timing issue. Order at 4, *United*

---

[5] The Carpenters call the question of when Jordan joined the Agreement a "defense." When Jordan joined is more correctly characterized as a question of fact.

*Bhd. of Carpenters & Joiners v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, No. 09-cv-2212 (D.D.C. Dec. 1, 2011). The Carpenters nevertheless contend that the denial of their motion "deprived [them] of the chance to thoroughly argue" the timing issue. *Jordan* Br. of Appellants 49–50. But they concede that they "would have proffered the largely same legal theories" had the district court permitted consolidation or rebriefing. Reply Br. of Appellants 31, *United Bhd. of Carpenters & Joiners v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, No. 11-7161. Because the Carpenters had nothing new to say, the district court did not abuse its discretion in denying briefing and argument on the timing issue.

## B.  No. 11-7155 (Frye)

The Carpenters also argue that the district court erred by failing to accord *Jordan Interiors I* preclusive effect in *Frye*. In *Jordan Interiors I*, the district court held that the arbitrator was without authority to award the disputed work to the Plasterers because the Board's section 9(a) certification of the SWRCC, which occurred after Jordan became a party to the Agreement, terminated the Agreement as between Jordan and Local 200. *Jordan Interiors I*, 744 F. Supp. 2d at 57. In *Frye*, the Carpenters argued that *Jordan Interiors I* estopped the Plasterers from defending the validity of the Pagan Award. The district court declined to give *Jordan Interiors I* estoppel effect because to do so with a judgment premised on a "misstatement of relevant fact . . . . would be unfair." *Frye*, 826 F. Supp. 2d at 215.

Although we ordinarily review a district court's estoppel ruling premised on "basic unfairness" for abuse of discretion, *see Connors v. Tanoma Mining Co.*, 953 F.2d 682, 684 (D.C. Cir. 1992) (citing *Jack Faucett Assoc's, Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 126 (D.C. Cir. 1984)), here, we need

not reach the merits of the issue. On the very day the district court announced its judgment in *Frye*, it granted the Plasterers' Rule 60(b) motion and vacated *Jordan Interiors I* with respect to the Kelly Award. *Jordan Interiors II*, 826 F. Supp. 2d at 242–43 n.1; *see also Klapprott v. United States*, 335 U.S. 601, 614–15 (1949) (Rule 60(b) power is power to "vacate judgments"). A judgment vacated either by the trial court or on appeal has no estoppel effect in a subsequent proceeding. *See United States v. Lacey*, 982 F.2d 410, 412 (10th Cir. 1992) ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel. The same is true, of course, of a judgment vacated by a trial court." (quotation marks omitted)); *see also Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985). The district court therefore correctly declined to give *Jordan Interiors I* estoppel effect in *Frye*.

### IV. Merits

As this case is before us on appeal from summary judgment grants, our review is *de novo*. *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011). We note at the outset that the Carpenters do not challenge the merits of the Awards. *See Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*, 589 F.3d 437, 441 (D.C. Cir. 2009) (explaining deferential standard of review of labor arbitration awards). Instead, the Carpenters challenge the arbitrators' authority to make the Awards and also argue that the Awards contravene public policy. Before addressing their arguments, we briefly explain the law governing the Agreement.

### A. Sections 8(f), 9(a) and PLAs

"Under sections 9(a) and 8(a)(5) of the [NLRA], employers are obligated to bargain only with unions that have

been 'designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes.' " *Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 533 (D.C. Cir. 2003) (quoting 29 U.S.C. § 159(a)); *see also* 29 U.S.C. § 158(a)(5) ("It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section [9(a)]."); *see also Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 738–39 (1961). "A union can achieve the status of a majority collective bargaining representative through either Board certification or voluntary recognition by the employer . . . ." *Raymond F. Kravis Ctr. for Performing Arts, Inc. v. NLRB*, 550 F.3d 1183, 1188 (D.C. Cir. 2008).

Section 8(f) of the NLRA, 29 U.S.C. § 158(f), carves out a limited exception to section 9(a)'s majority support requirement within the construction industry. Section 8(f) provides, in pertinent part:

> It shall not be an unfair labor practice . . . for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because [] the majority status of such labor organization has not been established under the provisions of section []9 prior to the making of such agreement . . . .

29 U.S.C. § 158(f). "Under this exception, a contractor may sign a 'pre-hire' agreement with a union regardless of how many employees authorized the union's representation." *Nova Plumbing*, 330 F.3d at 534; *see also Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 761 (D.C. Cir. 2012). The Congress

enacted this limited exception because construction employers must know their labor costs up front in order to generate accurate bids and must "have available a supply of skilled craftsmen ready for quick referral." *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 348 (1978) (*Higdon*) (quotation marks omitted). In addition, traditional union organization is not conducive to the brief, project-to-project periods workers spend in the employ of any single contractor. *See Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 231 (1993) (*Boston Harbor*); *see also Higdon*, 434 U.S. at 349.

A union that is party to a section 8(f) agreement serves as the section 9(a) exclusive bargaining representative of the unit it purports to represent for the duration of the section 8(f) agreement. *Viola Indus.-Elevator Div., Inc.*, 286 N.L.R.B. 306, 306 (1987), *enforced* 979 F.2d 1384 (10th Cir. 1992); *John Deklewa & Sons*, *Inc.*, 282 N.L.R.B. 1375, 1385 (1987) (*Deklewa*), *enforced sub nom. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988). But its section 9(a) status is limited in significant respects. A union party to a section 9(a) agreement is entitled to a conclusive presumption of majority status for up to three years, during which time decertification petitions are barred.[6] *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996). But under section 8(f), a union is entitled to no such presumption and parties may therefore file decertification petitions at any time during a section 8(f) relationship. *Nova Plumbing*, 330 F.3d at 534. Moreover,

---

[6] A section 9(a) certification absent any collective bargaining agreement entitles the certified union to a one-year presumption of majority status. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 37 (1987).

when a section 9(a) agreement expires, the presumption of majority support requires the employer to continue bargaining with the union unless the union has in fact lost majority support or the employer has a good-faith reason to believe such support has been lost. *See Auciello Iron Works*, 517 U.S. at 786–87 (citing *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 778 (1990)). But "because the union enjoys no presumption that it ever had majority support" under section 8(f), the employer can refuse to bargain once a section 8(f) agreement expires. *Nova Plumbing*, 330 F.3d at 534.

Even while operative, a section 8(f) agreement is not set in stone. If a union party to an 8(f) agreement "successfully seeks majority support, the prehire agreement attains the status of a [section 9(a)] collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *Higdon*, 434 U.S. at 350. "Generally, a union seeking to convert its section 8(f) relationship to a section 9(a) relationship may either petition for a representation election or demand recognition from the employer by providing proof of majority support." *M & M Backhoe Serv., Inc. v. NLRB*, 469 F.3d 1047, 1050 (D.C. Cir. 2006). But "a vote to reject the signatory union will void the 8(f) agreement and will terminate the 8(f) relationship." *Deklewa*, 282 N.L.R.B. at 1385.

As a PLA, the Agreement is a particular type of section 8(f) pre-hire agreement. We have previously explained that

a PLA is a multi-employer, multi-union pre-hire agreement designed to systemize labor relations at a construction site. It typically requires that all contractors and subcontractors who will work on a project subscribe to the agreement; that all contractors and subcontractors agree in advance to abide by a master collective bargaining agreement for all work on

the project; and that wages, hours, and other terms of employment be coordinated or standardized pursuant to the PLA across the many different unions and companies working on the project.

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002). Multi-employer, multi-union PLAs are commonplace in the construction industry because they serve the unique needs of the construction-industry labor market. Robert W. Kopp & John Gaal, *The Case for Project Labor Agreements*, CONSTR. LAW., Jan. 1999, at 5–7; Henry H. Perritt, *Keeping the Government out of the Way: Project Labor Agreements under the Supreme Court's* Boston Harbor *Decision*, 12 LABOR LAW. 69, 71–76 (1996). A PLA typically requires employers to recognize the signatory unions as the collective bargaining representatives of the employees engaged in work thereunder; to secure labor from union hiring halls; and to agree to the terms of the PLA before working on projects governed by the PLA. *BIECA*, 678 F.3d at 186. A PLA also typically standardizes wages, work rules and hours; provides for the supremacy of the PLA over conflicting provisions of individual collective bargaining agreements; and contains no-strike, union security and dispute resolution provisions. *See id.* The Agreement, a prototypical PLA, contains all of these provisions.

### B. Arbitrators' Authority

The Carpenters argue that arbitrators Kelly and Pagan lacked authority to enter their respective Awards. "An arbitrator's power is both derived from, and limited by, the collective-bargaining agreement." *Barrentine v. Ark.-Best Freight Sys. Inc.*, 450 U.S. 728, 744 (1981). Because an arbitrator cannot rule on matters the parties have not agreed to arbitrate, *see AT&T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 648–49 (1986) ("[A]rbitrators derive their

authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."), *a fortiori* he cannot decide the rights of non-parties.

The Carpenters challenge the arbitrators' authority on three bases. First, they argue that the Agreement is void as between Local 200 and the Employers because the duty of exclusive bargaining forbids an employer in a section 9(a) relationship with one union from entering into a section 8(f) agreement with any other union. Second, they argue that the Board's certification of the SWRCC in effect decertified Local 200 as the representative of the Employers' workers and voided the Agreement as between Local 200 and the Employers. Finally, the Carpenters argue that the disputes are representational in nature and therefore beyond the arbitrators' authority.

1. SWRCC's § 9(a) Certifications and Right of Exclusive Representation in PLA Context

The Carpenters first argue that "the principle of exclusive representation precludes any Section 8(f) agreement between [the Employers] and [Local 200]." Br. of Appellants 32, *United Bhd. of Carpenters & Joiners v. Operative Plasterer's & Cement Masons' Int'l Ass'n*, No. 11-7155 (*Frye* Br. of Appellants); *Jordan* Br. of Appellants 31. They contend that because the section 9(a) certifications trigger the duty of exclusive bargaining, the Employers cannot also enter a multi-unit PLA—like the Agreement—because doing so would violate their duty to bargain only with the SWRCC over work assignments.

We need not decide whether section 9(a) categorically permits the Agreement. The Carpenters concede that the Agreement between the Employers and all signatory unions is permissible under section 8(f). *See Boston Harbor*, 507 U.S.

at 230 (approving multiemployer, multi-union PLAs under section 8(f)). But, they argue, the Agreement is unlawful under section 9(a) because, unlike section 8(f), an employer in a section 9(a) relationship owes the union a duty of exclusive bargaining. Section 8(f) is an exception to the majority support requirement, however, *not* to the exclusive bargaining requirement of sections 9(a) and 8(a)(5). *See Madison Indus., Inc.*, 349 N.L.R.B. 1306, 1307 (2007); *Deklewa*, 282 N.L.R.B. at 1387 & n.50. As we have explained, a union party to a section 8(f) agreement serves as the limited section 9(a) representative of the bargaining unit it purports to represent during the term of that agreement. *Deklewa*, 282 N.L.R.B. at 1387; *see also id.* at 1386 ("It is clear that the imposition of enforceable contract obligations on signatories to an 8(f) agreement is contingent, in part, on the signatory union possessing exclusive representative status.").[7] Section 8(a)(5) forbids an employer in a section 8(f) agreement from repudiating the agreement and negotiating with a non-signatory union (at least while the agreement is in effect) in precisely the same way that section 8(a)(5) forbids an employer from refusing to bargain with a union certified under section 9(a). *See Local No. 150, Int'l Union of Operating Eng'rs v. NLRB*, 480 F.2d 1186, 1191 (D.C. Cir.

---

[7] We previously rejected the Board's pre-*Deklewa* interpretation of section 8(f) in favor of the one it articulated in *Deklewa*. *See Local 150, Int'l Union of Operating Eng'rs v. NLRB*, 480 F.2d 1186, 1190–91 (D.C. Cir. 1973); *see also Deklewa*, 282 N.L.R.B. at 1387–88. Moreover, seven sister circuits have explicitly adopted the Board's interpretation of section 8(f). *Am. Automatic Sprinkler Sys., Inc. v. NLRB*, 163 F.3d 209, 215 n.3 (4th Cir. 1998) (citing cases). Only the Fourth Circuit has rejected *Deklewa* and did so because of preexisting contrary circuit precedent. *Indus. TurnAround Corp. v. NLRB*, 115 F.3d 248, 254 (4th Cir. 1997) (citing *Clark v. Ryan*, 818 F.2d 1102 (4th Cir. 1987)).

1973) ("[A]n employer[] who has entered into a validly executed § 8(f) pre-hire agreement . . . should be held to the same standard of conduct in regard to unfair labor practices as an employer who has entered into a collective bargaining agreement with a union certified to have majority status."); *see also GEM Mgmt. Co.*, 339 N.L.R.B. 489, 501 (2003). The Carpenters' argument therefore fails because if, as the Carpenters concede, the Agreement does not violate the duty of exclusive bargaining under section 8(f), it does not do so under section 9(a).[8]

---

[8] The Carpenters also argue that section 8(f) agreements cannot "trump the Section 7 [of the NLRA, 29 U.S.C. § 157] rights of workers at any time." *Frye* Br. of Appellants 31; *Jordan* Br. of Appellants 30.  We agree but the Carpenters fail to point to anything in the Agreement that violates section 7's guarantee of the rights of self-organization and collective bargaining.  Unions and employers are free to alter the scope of bargaining units—even units certified pursuant to section 9(a)—by entering into multi-unit agreements like the Agreement. *See The Idaho Statesman v. NLRB*, 836 F.2d 1396, 1400 (D.C. Cir. 1988); *Utility Workers Union*, 203 N.L.R.B. 230, 238 (1973), *enforced* 490 F.2d 1383 (6th Cir. 1974); *Shell Oil Co.*, 194 N.L.R.B. 988, 995 (1972) ("It is well settled that the parties to a collective-bargaining relationship may *voluntarily* agree . . . to the enlargement or alteration of an existing unit, or to the merger of separate units, theretofore recognized by the parties or found by the Board to be appropriate for the purposes of collective bargaining." (emphasis in original)), *review denied sub nom. Oil, Chem. & Atomic Workers, Int'l Union v. NLRB*, 486 F.2d 1266 (D.C. Cir. 1973).  We therefore cannot conceive of how the voluntary merger of the units represented by the SWRCC and Local 200 in this run-of-the-mill PLA violates section 7.  Moreover, given that the NLRA "not only tolerates but actively encourages voluntary settlements of work assignment controversies between unions," *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 266 (1964), we see nothing in the Agreement's arbitration provisions that violates section 7.

### 2. Certification of SWRCC *qua* Decertification of Local 200

Relying on *Deklewa*, the Carpenters next argue that by certifying the SWRCC as the exclusive bargaining representative of the Employers' employees, the Board necessarily decertified Local 200 as the representative of those Employees, thereby voiding the Agreement as between the Employers and Local 200. Their argument proceeds as follows: the Agreement's recognition clause—which provides that "[t]he Contractor recognizes the Council and the signatory local Unions as the exclusive bargaining representative for the employees engaged in Project Work," PSA § 3.1, *Frye* JA 256—obligates signatory employers to recognize all of the signatory unions as the exclusive representatives of each and every employee. Under *Deklewa*, if a bargaining unit subsequently votes to reject the union purporting to represent it under a section 8(f) agreement, that vote "will void the [section] 8(f) agreement and will terminate the [section] 8(f) relationship." *Deklewa*, 282 N.L.R.B. at 1385. The Carpenters reason that the employees' vote in favor of the SWRCC also in effect rejected, and therefore decertified, Local 200. And under *Deklewa* those decertifications voided the Agreement between Local 200 and the Employer, terminating the arbitrator's authority.[9]

---

[9]The parties dispute whether the Employers joined the Agreement before or after the SWRCC was certified. If the Employers became parties after the SWRCC was certified, its certifications could not have decertified Local 200 because, even under the Carpenters' theory, the Employers had not yet recognized Local 200. We decline to resolve the dispute because, even assuming *arguendo* the Employers became parties to the Agreement before the certifications, the certifications did not decertify Local 200.

We reject the Carpenters' reading of the Agreement's recognition clause. The clause merely requires what section 8(f) permits: employers must recognize the signatory unions as the exclusive bargaining representatives of the employees they purport to represent—for work governed by the Agreement—irrespective of any showing of majority support and irrespective of whether a particular employee is in fact a member of the signatory union. *See Trustees of S. Cal. IBEW-NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1047–48 (9th Cir. 2008); *see also Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279 (1956) ("Like other contracts, [a collective bargaining agreement] must be read as a whole and in the light of the law relating to it when it was made."). Because the Agreement's recognition clause did not require the Employers to recognize Local 200 as the representative of their employees, the Board's certification of the SWRCC did not affect the contractual relationship between the Employers and Local 200. In fact, assuming *arguendo* that the representation certifications took place after the Employers joined the Agreement, the employees' election can be seen as ratifying the Employers' and the SWRCC's decisions to enter into the section 8(f) Agreement. *See Comtel Sys. Tech., Inc.*, 305 N.L.R.B. 287, 290 & n.14 (1991). The section 9(a) certifications of the SWRCC therefore did not void the Agreement as between the Employers and Local 200.

### 3. Representational vs. Jurisdictional Nature of the Dispute

Finally, the Carpenters argue that the dispute between the unions is representational, not jurisdictional. Because the Board has exclusive jurisdiction over representation questions, *see Road Sprinkler Fitters Local Union 669 v. Herman*, 234 F.3d 1316, 1320 (D.C. Cir. 2000), they argue that the arbitrators had no authority to decide the dispute between the Carpenters and the Plasterers. But as the

Carpenters concede, Local 200 disclaims any interest in representing the Employers' employees. Local 200 claims that it only wants to obtain the plastering work for its members and nothing in the record suggests otherwise. Because this case is simply "a contest between two groups of employees . . . actively contend[ing] for disputed work," the dispute is paradigmatically jurisdictional. *Sea-Land*, 884 F.2d at 1411 (emphases deleted); *see also Sierra Pacific*, 85 F.3d at 652. The Carpenters' argument thus rests on an unstated assumption, to wit, that the section 9(a) certifications entitle their members to all work contracted out to the Employers pursuant to the Agreement.

Their assumption—and therefore their argument—suffers from a fatal flaw: the Board's certification of a particular bargaining unit is not a determination of the work to which that unit is entitled. As the Supreme Court has explained:

> [A] Board certification in a representation proceeding is not a jurisdictional award; it is merely a determination that a majority of the employees in an appropriate unit have selected a particular labor organization as their representative for purposes of collective bargaining. It is true that such certification presupposes a determination that the group of employees involved constitute an appropriate unit for collective bargaining purposes, and that in making such determination the Board considers the general nature of the duties and work tasks of such employees. However, unlike a jurisdictional award, this determination by the Board does not freeze the duties or work tasks of the employees in the unit found appropriate. Thus, the Board's unit finding does not per se preclude the employer from adding to, or subtracting from, the employees' work assignments. While that finding may be determined by, it does not

determine, job content; nor does it signify approval, in any respect, of any work task claims which the certified union may have made before this Board or elsewhere.

*Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 269 (1964) (quotation marks omitted). The Board has further clarified that

> its sole function in representation proceedings is to ascertain and certify the name of the bargaining representative, if any, that has been designated by the employees in the appropriate unit. It is not the Board's responsibility in representation proceedings to decide whether employees in the bargaining unit are entitled to do any particular work or whether an employer has properly reassigned work from employees in the bargaining unit to other employees.

*Gas Serv. Co.*, 140 N.L.R.B. 445, 447 (1963). The Board's certification of the SWRCC as the exclusive bargaining representative of the Employers' employees thus decides nothing about the work to which those employees are entitled under the Agreement.[10] Because this dispute is

---

[10] In fact, when the Board resolves a jurisdictional dispute under its section 10(k) authority, a section 9(a) certification is but a single factor of a multi-factor test. *See Int'l Ass'n of Machinists, Lodge No. 1743*, 135 N.L.R.B. 1402, 1410–11 (1962); *see also, e.g.*, *Int'l Bhd. of Elec. Workers, Local 196*, 358 N.L.R.B. No. 87, slip op. at 5–6 (July 24, 2012). Although such certification "favors awarding the disputed work to employees represented by" the certified union, *Int'l Union of Operating Eng'rs, Local 150*, 354 N.L.R.B. No. 112, slip op. at 5 (Nov. 30, 2009), it is not dispositive. Indeed, the Board has awarded work to an uncertified union over a certified one. *See, e.g.*, *Int'l Longshoremen's & Warehousemen's Union, Local 8*, 324 N.L.R.B. 666, 667–68

quintessentially jurisdictional and a section 9(a) certification does not resolve work assignment questions, the arbitrators were plainly authorized to make the Awards.

## C. Consistency with Other Law

The Awards are interpretations of the Agreement and treated as part of the Agreement itself. *See Cole*, 105 F.3d at 1475 ("In the absence of fraud or an overreaching of authority on the part of the arbitrator, he is speaking for the parties, and his award *is* their contract." (quotation marks omitted)). As with any contract, "an arbitration award that is in explicit conflict with other laws and legal precedents[] is unenforceable." *Am. Postal Workers Union v. U.S. Postal Serv.*, 550 F.3d 27, 32 (D.C. Cir. 2008) (quotation marks and citations omitted); *see also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42 (1987) ("A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy."). "[T]he question of public policy is ultimately one for resolution by the courts. Such a public policy, however, must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983) (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)).

---

(1997). Moreover, the Supreme Court rejected the Board's previous approach that made representation certifications nearly dispositive. *See Plasterers' Local*, 404 U.S. at 130–31.

The Carpenters argue that the Awards are invalid because they run counter to a sister circuit's decision as well as a Board order arising from a series of disputes between Local 200 and the SWRCC. The history of these disputes is laid out in detail by the Ninth Circuit in *Small v. Operative Plasterers' & Cement Masons' International Association, Local 200*, 611 F.3d 483 (9th Cir. 2010), to which we refer only as necessary to reject the Carpenters' argument. In *Small*, the district court enjoined Local 200 from prosecuting two state-court lawsuits against the SWRCC while the Board determined whether that litigation constituted an unfair labor practice. *Id.* at 489. The Ninth Circuit affirmed, reasoning that because the law suits would undermine two previous Board section 10(k) determinations, *see Standard Drywall II*, 348 N.L.R.B. at 1252; *Standard Drywall I*, 346 N.L.R.B. at 478, the Board was likely to conclude that the suits violated section 8(b)(4)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(D). *Id.* at 493–94.

The Board subsequently ruled that the lawsuits enjoined in *Small*, as well as several arbitration awards obtained by Local 200, in fact constituted unfair labor practices under section 8(b)(4)(D) because they conflicted with the Board's earlier section 10(k) determinations of several jurisdictional disputes decided in the SWRCC's favor. *Operative Plasterers' & Cement Masons' Int'l Ass'n, Local 200*, 357 N.L.R.B. No. 160, slip op. at 4–7 (Dec. 30, 2011) (*Standard Drywall III*). The Board ordered Local 200 to

> [c]ease and desist from . . . [t]hreatening, coercing, or restraining SDI, or any other person or employer engaged in commerce or in an industry affecting commerce, where an object of their actions is to force or require the employer to assign plastering work to Local 200's members, rather than to its own employees who are not members of Local 200.

*Operative Plasterers' & Cement Masons' Int'l Ass'n, Local 200*, 357 N.L.R.B. No. 179, slip op. at 6 (Dec. 31, 2011) (*Standard Drywall IV*). This language closely tracks that of section 8(b)(4)(D) and is plainly intended to enjoin Local 200 from violating that provision.

We begin with the proposition that seeking arbitration "is not coercive for the purposes of § 8(b)(4)(D)." *Ga.-Pac.*, 892 F.2d at 132; *see also Brockton Newspaper Guild*, 275 N.L.R.B. 135, 136 (1985). A party violates section 8(b)(4)(D), however, if it subverts a section 10(k) decision by seeking arbitration of a jurisdictional dispute *after* the Board has determined the dispute pursuant to section 10(k). *Sea-Land*, 884 F.2d at 1413–14; *see also N. Cal. Dist. Council of Laborers*, 292 N.L.R.B. 1035, 1035 (1989). Although the Carpenters argue that the Board's certification orders have the same effect as a section 10(k) determination, "a Board certification in a representation proceeding is not a jurisdictional award." *Carey*, 375 U.S. at 269 (quotation marks omitted). Because the Board has made no section 10(k) determination that the Awards could subvert, the Awards conflict neither with *Small* nor with the Board's *Standard Drywall IV* order.

The Carpenters next argue that, because the Employers are not parties in this litigation, the district court could not order the Employers to subcontract the disputed work to Local 200-staffed subcontractors. We agree, but this issue is of no significance because the district court did not order the Employers to do anything. The Employers' absence from this litigation is therefore irrelevant.

The Carpenters also argue that, because the Awards will likely require the Employers to subcontract the disputed work to firms employing Local 200 members, the Awards violate section 4107 of the California Public Contract Code, which

places certain limitations on the ability of prime contractors to substitute subcontractors or permit the reassignment of previously awarded subcontracts. CAL. PUB. CONT. CODE § 4107(a), (b). We need not wade into California public contracting law. The arbitrators determined only that the disputed work belonged to the Plasterers and the district court affirmed their determinations. Nothing in the Awards or the district court orders violates California law because they do not require the Employers to enter into any subcontracts; they leave the question of the nature of the parties' compliance unanswered.[11]

Finally, the Carpenters argue that, because the Plasterers disclaim any intent to represent the Employers' employees, the Agreement violates section 8(e) of the NLRA, 29 U.S.C. § 158(e). Relevant here, section 8(e) prohibits subcontracting agreements—agreements between an employer and a union in which the employer promises to subcontract work only to unionized employers. *See Truck Drivers Local Union No. 413 v. NLRB*, 334 F.2d 539, 548 (D.C. Cir. 1964). But section 8(e) also contains a "construction industry proviso" excepting the construction industry from its prohibition on subcontracting agreements as to "contracting or subcontracting work to be done at the site of the construction." 29 U.S.C. § 158(e); *see also Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 657 (1982); *Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 873 & n.21 (D.C. Cir. 1980).

The Carpenters do not identify a particular clause of the Agreement that, they claim, violates section 8(e). Instead,

---

[11] And, in any event, the rights protected by section 4107 belong to subcontractors. *See S. Cal. Acoustics Co. v. C.V. Holders, Inc.*, 71 Cal. 2d 719, 727 (1969); *R.J. Land & Assocs. Const. Co. v. Kiewit-Shea*, 69 Cal. App. 4th 416, 421 (1999).

they contend that the Plasterers' "scheme" violates section 8(e) under the Supreme Court's decision in *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616 (1975) because the Plasterers have no intention of representing the Employers' employees. But *Connell* held only that a "stranger" agreement—a subcontracting agreement between a union and contractor where (1) the union does not seek to represent the contractor's employees and (2) the two parties are not in a collective bargaining relationship—does not fall within the construction industry proviso. *Connell*, 421 U.S. at 627–28, 636. In contrast, the proviso protects "subcontracting clauses that are sought or negotiated in the context of a collective-bargaining relationship," *Woelke & Romero*, 456 U.S. at 648, and Local 200 and the Employers are parties to a section 8(f) multiemployer, multi-union collective bargaining agreement, s*ee Donald Schriver*, 635 F.2d at 873, 875 (section 8(f) agreement qualifies as collective bargaining agreement under *Connell*). The Agreement therefore is not a stranger agreement under *Connell*.

For the foregoing reasons, in No. 11-7155 and No. 11-7161 we affirm the district court's grants of summary judgment to the Plasterers, thereby confirming the arbitrators' Awards in their favor.

*So ordered*.